Filed 3/26/26  In re X.W. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re X.W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>X.W.,<br><br>        Defendant and Appellant. | A172965<br><br>(Mendocino County<br>Super. Ct. No. 24JD00075-1) |

X.W. appeals from a restitution order for $6,475 of mental health services that was entered after she admitted committing a misdemeanor assault against another high school student, C.S.  After seeking treatment, C.S. was diagnosed with attachment disorder, a condition that preexisted the assault.

On appeal, X.W. claims that (1) there was insufficient evidence she was the but-for cause of all the mental health services C.S. received; (2) the juvenile court's refusal to release C.S.'s mental health records or allow X.W. to question C.S.'s service providers violated due process; and (3) we should independently review C.S.'s school disciplinary records to determine whether

the juvenile court correctly declined to order their disclosure. We reject the first two claims, and our review of the disciplinary records shows the court did not err by concluding they were immaterial. Thus, we affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.      *The Underlying Incident and the Case's Disposition*

In November 2023, 15-year-old X.W. and 14-year-old C.S. were both students at a Sonoma County high school. Video footage from the school showed X.W. approach C.S. A "verbal altercation" took place, during which C.S. "was seen with both hands in her pockets." X.W. eventually hit C.S. in the head and "took [her] to the ground." X.W. then got on top of the other girl "and began to punch her multiple times in the head and torso." Eventually, school personnel arrived and broke up the fight.

C.S. went to urgent care after the attack. As reported by her mother, she "sustained a swollen left eye and bruising, a small laceration on her lip, and bruising on the back of her neck." C.S. also had a concussion.

The Sonoma County District Attorney filed a wardship petition alleging that the juvenile court had jurisdiction over X.W. under Welfare and Institutions Code[1] section 602, subdivision (a). The operative petition contained two felony counts, battery with serious bodily injury and assault by means likely to produce great bodily injury (GBI), and a misdemeanor count of battery.[2] In May 2024, X.W. admitted to a reduced misdemeanor count of

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] The allegations were made under Penal Code sections 243, subdivision (d) (battery with serious bodily injury), 245, subdivision (a)(4) (assault by means likely to produce GBI), and 242 (simple battery).

2

assault by means likely to produce GBI. The case was then transferred to Mendocino County, X.W.'s county of residence.

At the July 2024 disposition hearing, the juvenile court placed X.W. on non-wardship probation under section 725. The following January, the court terminated X.W.'s probation as successful and ordered the matter sealed under section 786. It reserved the issue of restitution.

### B. The Restitution Proceedings

The People ultimately sought $6,475 for mental health services C.S. received from two different providers between April and June 2024. In an undated letter submitted with the restitution request, C.S.'s mother explained, "After [C.S.] was attacked, she started to spiral so we found a family therapist," Dr. Mary Susan Sams, PsyD, "to talk to as a family to support [C.S.] emotionally." The letter continued, "[A]fter a few appointments it was apparent to [Dr. Sams] that [C.S.] need[ed] to speak to a Psychotherapist . . . [because] what [C.S.] was dealing with was much more complex and we needed to find out exactly what i[t] was so we could take the next steps to fix it."

The family then sought a neuropsychological evaluation from Dr. Eliza Lehrke, PsyD. As described by C.S.'s mother, the evaluation showed that C.S. was "having a form of P[TS]D due to the attack." C.S., who was adopted, was also diagnosed with attachment disorder. Her mother continued, "[C.S.] . . . experienced abuse before we brought her home and due to this attack [by X.W.], it has brought it all back up, and we are now dealing with a sever[e] case of [attachment] disorder."

In response to the restitution request, X.W. subpoenaed "[a]ll billing and payment records" and "[a]ll notes and reports pertaining to intake, diagnostics, evaluations, and treatment (past and ongoing)" from Drs. Sams

3

and Lehrke. X.W. also subpoenaed from the high school C.S.'s "disciplinary records and notes" for the 2023–2024 academic year.

At an October 2024 hearing for receipt of the subpoenaed records, an attorney who appeared for Dr. Sams objected to releasing any records on the basis of psychotherapist–patient privilege under Evidence Code section 1014. Dr. Lehrke, who appeared herself, relied on the same privilege to oppose releasing "the clinical content of [her] evaluation," although she had "authorization from the family to release [her] bill of record of what was done and the bill receipt of payment." C.S.'s parents likewise objected to the release of their daughter's mental health records. The family did not oppose the release of C.S.'s disciplinary records, which the high school had provided.

X.W.'s trial counsel explained that she subpoenaed the mental health records because she was "seeking evidence that [C.S.'s] injuries . . . [were] related to [X.W.'s] conduct as opposed to the . . . issue that [was] already in existence," namely attachment disorder. The juvenile court questioned whether, assuming X.W. "contribut[ed] to any of the need for therapy," it would be possible to "parse . . . out" which portions of C.S.'s treatment were due to the criminal conduct. X.W.'s counsel responded that while she might agree "if this was just normal therapy," it was not clear that C.S.'s potential treatment and the "extensive psych eval" for an existing disorder resulted from X.W.'s conduct. Admitting there were "issues regarding the [psychotherapist-patient] privilege," counsel asked the court to perform an in camera review of the mental health records.

The juvenile court took the matter under submission. At a November 2024 hearing, the court declined to review or release the mental health records. It found there was "an overriding and compelling interest in maintaining confidentiality" that outweighed what would be an "incredibly

4

intrusive and futile" effort to attempt "to ascertain what, if any, portion of the treatment can be attributed to the assault." The court did, however, order both Drs. Sams and Lehrke to "disclose a list of dates and costs of the treatment."

As for the school disciplinary records, the juvenile court had already conducted an in camera review and could not "see how they're relevant to the issue of restitution." As a result, the court declined to order their release either.

The restitution hearing was held in February 2025. The juvenile court admitted into evidence the prosecution's restitution request, which included C.S.'s mother's letter and the billing records of Drs. Sams and Lehrke. Dr. Sams's records showed she had eight $200 sessions with C.S. between February 28 and May 28, 2024.[3] Dr. Lehrke's records showed she spent 19.5 hours, billed at $250 per hour, to perform a "Neuropsychological Assessment" of C.S. between April 12 and June 14, 2024. This included an intake appointment on April 12, several hours of testing and scoring, six hours on June 10 to "interpret[] results" and generate a report, and one hour on June 14 for "feedback with parents."[4]

C.S.'s mother testified at the restitution hearing. After the assault, C.S. "was struggling a lot" and "depressed." C.S. "never admitted she was scared," but her mother "could tell she was afraid. She never would walk home by herself any[]more." C.S. had attachment disorder "[f]rom being

---

[3] These records show one treatment code and diagnostic code for the first four sessions and a different treatment code and diagnostic code for the last four sessions, but the code numbers are not defined.

[4] As June 14, 2024, was a Friday and C.S.'s mother's letter said the evaluation's "results came in on Friday," it appears the letter was written sometime the following week.

5

adopted," not from being assaulted, but the assault "made it worse." C.S.'s mother indicated that the family would not "have sought treatment for [C.S.] either with Dr. Sams or with Dr. Lehrke" if the assault had not occurred.

After hearing argument, the juvenile court took the matter under submission. In a March 27, 2025 written order, the court found that C.S.'s mother's testimony "provided a sequential order wherein the criminal conduct occurred . . . [and] the victim's behavior changed dramatically, culminating in the need for mental health treatment for the victim. While there may have been mental health issues prior to the assault that contributed to the gravity of the victim's decline, [X.W.] is nonetheless responsible for the resulting need for treatment. There was no evidence to suggest that [C.S.] needed or that the family would have sought treatment had the crime not occurred." The court therefore ordered X.W. to pay $6,475 in restitution, the full amount sought.

## II.
### DISCUSSION

#### A. *There Was Substantial Evidence that X.W.'s Conduct Was the But-for Cause of All of C.S.'s Mental Health Services.*

X.W. first claims there was insufficient evidence that she was the but-for cause of all the mental health services C.S. received. X.W. therefore seeks a remand "for more detailed findings linking [her] to all the treatment sessions." We are not persuaded.

The "victim of conduct for which a minor is found to be a person described in Section 602 who incurs an economic loss as a result of the minor's conduct" is entitled to direct restitution from the minor. (§ 730.6, subd. (a)(1).) "We apply tort principles of causation to determine whether a loss was the result of the [criminal] conduct." (*People v. Trout-Lacy* (2019) 43 Cal.App.5th 369, 372.) We agree with X.W. that but-for causation is the

6

only aspect of causation we need address, as this case does not involve concurrent independent causes or any proximate-cause issues. (See *id.* at p. 372 & fn. 2.)

At a restitution hearing, the People have the burden of proof by a preponderance of the evidence. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542.) Upon "a prima facie showing of economic losses incurred as a result of" the criminal conduct, the burden shifts to the defendant "to disprove the amount of losses claimed by the victim." (*Id.* at p. 1543.) Although we generally review a restitution order for an abuse of discretion, we apply substantial-evidence review " '[w]here the specific issue is whether the [lower] court's factual findings support restitution.' " (*People v. Trout-Lacy*, *supra*, 43 Cal.App.5th at p. 373.) In performing this review, we " 'do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact.' " (*Gemelli*, at pp. 1545–1546.)

X.W. argues that although the evidence "established that [her] conduct motivated [C.S.] to seek treatment[,] . . . there was no evidence that the later treatment was related in any way to the fight." Pointing to other decisions affirming restitution orders in which therapists gave statements that the victim's mental health treatment was related to the defendant's conduct, X.W. contends that C.S.'s mother's "general statement that [her daughter's] preexisting disorder was made worse by [X.W.]" was insufficient. (See *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1209–1210 [therapist testified that therapy was "causally related" to victim's rape]; *People v. Cain* (2000) 82 Cal.App.4th 81, 88–89 (*Cain*) [therapist stated that counseling was "100 percent related to the crime"].)

7

Although X.W. is correct that the providers here did not themselves attest to the causal link between the assault and C.S.'s treatment, none of the case law cited establishes that such evidence is required. (See *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1502 [specific facts in other cases "unhelpful" when performing substantial-evidence review].) In arguing that "[t]he bare fact" that C.S. received mental health services after the assault is insufficient, X.W. overlooks other substantial evidence that her conduct was the but-for cause of the services. (Boldface omitted.)

It is undisputed that C.S. sought treatment from Dr. Sams because of the fight with X.W. And notably, all of the sessions with Dr. Sams occurred *before* Dr. Lehrke provided her report to C.S.'s parents. In other words, *no* treatment for which restitution was sought happened after C.S.'s diagnosis with attachment disorder. Moreover, X.W. fails to mention C.S.'s mother's statement that Dr. Lehrke also determined C.S. had PTSD "due to the attack." This, combined with the mother's testimony that the attack made C.S.'s attachment disorder worse, constitutes substantial evidence that X.W.'s conduct was a but-for cause of all of C.S.'s treatment with Dr. Sams.

As for Dr. Lehrke's services, which were aimed at generating a neuropsychological evaluation instead of "treating" C.S., there was also substantial evidence of a sufficient causal link to X.W.'s conduct. C.S.'s mother testified that the family likewise would not have sought Dr. Lehrke's services but for the assault. And until the evaluation was complete, there was no way to be sure which conditions C.S. had and how they related to the assault. The juvenile court could rationally conclude that the mere fact that the evaluation showed C.S. had a significant disorder predating the assault did not negate the need for that evaluation, particularly since there was

substantial evidence that the assault caused PTSD as well and worsened the existing disorder.

X.W.'s argument might have more force had restitution been sought for therapy that occurred after C.S. was diagnosed with attachment disorder. But because all of the mental health services occurred either before the diagnosis or as a means to obtain the diagnosis, there is no reasonable possibility that they were attributable solely to the preexisting disorder. In short, there was substantial evidence that X.W.'s criminal conduct was a but-for cause of all of the mental health services C.S. obtained.

B.     *X.W. Was Not Denied Due Process.*

X.W. also claims that the juvenile court denied her due process by refusing to disclose the mental health records or allow her to question Drs. Sams and Lehrke at the restitution hearing. Again, we are not persuaded.

"The scope of a criminal defendant's due process rights at a hearing to determine the amount of restitution is very limited." (*Cain, supra*, 82 Cal.App.4th at p. 86.) The defendant must have " ' "notice of the amount of restitution claimed" ' " and " ' "an opportunity to challenge the figures." ' " (*Ibid.*) A due process violation occurs only if "the hearing procedures are fundamentally unfair." (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 783.)

At the restitution hearing, X.W.'s trial counsel reasserted her request for the subpoenaed mental health records, addressing the juvenile court as follows: "I think that would clear up a lot of this. . . . Those were denied to me as far as being able to differentiate what may have been related to attachment disorder versus this incident. And then at that hearing your Honor had also stated that if I had subpoenaed the doctor, I would not be able to question her at this hearing either. I think that significantly impairs my

9

ability to address whether or not these damages are related to [X.W.]" The court did not respond to this argument.

X.W. and the Attorney General disagree about whether the juvenile court actually precluded X.W. from calling Dr. Sams or Dr. Lehrke at the restitution hearing, as opposed to precluding merely disclosure of C.S.'s mental health records. Assuming, without deciding, that the court effectively barred X.W. from questioning either provider, we perceive no due process violation.

*Cain* is instructive. That decision held that a trial court did not violate a criminal defendant's due process rights by not allowing the defendant to confront and cross-examine the therapist who provided counseling to his victim. (*Cain*, *supra*, 82 Cal.App.4th at pp. 84–85, 87.) The appellate court noted that even though the defendant could not question the therapist, he "had full and fair opportunity to present affirmative evidence that counseling received by the victim was not directly related to the crime," such as evidence of the victim's previous mental health treatment. (*Id.* at p. 87.) Similarly, X.W. could have presented other evidence, including from any experts she might have retained, to cast doubt on the link between C.S.'s treatment and the assault. Moreover, X.W. had and exercised the opportunity to cross-examine C.S.'s mother about C.S.'s attachment disorder and the link between the assault and C.S.'s treatment.

X.W. suggests *Cain* is distinguishable because the therapist there submitted "a sworn statement . . . that the counseling was directly related to the crime." (*Cain*, *supra*, 82 Cal.App.4th at p. 85.) But nothing in *Cain*, or any other authority X.W. cites, establishes that such evidence is *required* to comport with due process if the provider is not allowed to testify. Nor do we agree with X.W.'s bare claim that "[o]nly the treatment provider(s) could

10

answer the relevant questions of causation." To the contrary, and as we already explained above, C.S.'s mother's statements and the providers' billing records established a sufficient causal link between the assault and the mental health services C.S. received. There was no due process violation.

### C. *The Juvenile Court Correctly Determined that the School Disciplinary Records Were Immaterial.*

Finally, X.W. asks us to perform an independent review of C.S.'s school disciplinary records to determine whether the juvenile court correctly concluded that they were not relevant to the issue of restitution. The Attorney General does not oppose the request.

We have reviewed the school disciplinary records that the juvenile court reviewed.[5] X.W. claims the records are relevant to the extent they show that C.S. "was having issues prior to the fight, which could affect a determination of causation for her treatment." We see nothing in the records, however, that bears on whether C.S. was entitled to restitution for the mental health services she received. As a result, the court did not abuse its discretion in declining to disclose the records. (See, e.g., *People v. Samayoa* (1997) 15 Cal.4th 795, 827 [reviewing nondisclosure of records under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531]; *People v. Hobbs* (1994) 7 Cal.4th 948, 976 [reviewing nondisclosure of confidential informant's identity].)

---

[5] Although X.W. also mentions reviewing "sealed proceedings," it does not appear that the juvenile court conducted a separate hearing as part of its in camera review. Even if a separate hearing were required, the issue was forfeited by X.W.'s failure to object below on this basis.

11

## III.
### DISPOSITION

The March 27, 2025 order awarding $6,475 in direct restitution to C.S. is affirmed.

_____

Humes, P. J.


WE CONCUR:


_____

Langhorne Wilson, J.


_____

Smiley, J.


*In re X.W.* A172965

13